IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **ASHLEY GREEN, Administrator** | ) | **CASE NO:**_____ |
| **Of the estate of JAZMIR TUCKER** | ) | |
| **Deceased** | ) | **JUDGE:**_____ |
| **c/o Wright & Schulte, LLC.** | ) | |
| **130 West 2nd Street, Suite 1600** | ) | |
| **Dayton, Ohio 45402** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **COMPLAINT** |
| | ) | |
| **CITY OF AKRON, OHIO** | ) | **(Jury Demand Endorsed Hereon)** |
| **c/o Akron Law Director** | ) | |
| **161 S. High St., Suite 202** | ) | |
| **Akron, OH  44308** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **MAYOR SHAMMAS MALIK** | ) | |
| **c/o Akron Law Director** | ) | |
| **161 S. High St., Suite 202** | ) | |
| **Akron, OH  44308** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **CHIEF BRIAN HARDING** | ) | |
| **c/o Akron Law Director** | ) | |
| **161 S. High St., Suite 202** | ) | |
| **Akron, OH  44308** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **OFFICER DAVON FIELDS** | ) | |
| **c/o Akron Law Director** | ) | |
| **161 S. High St., Suite 202** | ) | |
| **Akron, OH  44308** | ) | |
| | ) | |

1

and )
)
**SERGEANT JOSEPH WOODIN** )
c/o Akron Law Director )
161 S. High St., Suite 202 )
Akron, OH  44308 )
)
and )
)
**SERGEANT KYLE FARR** )
c/o Akron Law Director )
161 S. High St., Suite 202 )
Akron, OH  44308 )
)
and )
)
**SERGEANT ADAM GUILMETTE** )
c/o Akron Law Director )
161 S. High St., Suite 202 )
Akron, OH 44308 )
)
and )
)
**SERGEANT D. RAY** )
c/o Akron Law Director )
161 S. High St., Suite 202 )
Akron, OH  44308 )
)
and )
)
**OFFICER STEVEN LOAR** )
c/o Akron Law Director )
161 S. High St., Suite 202 )
Akron, OH  44308 )
)
and )
)
**JOHN DOES 1-10** )
c/o Akron Law Director )
161 S. High St., Suite 202 )
Akron, OH  44308 )
)
        **Defendants.** )

2

---

"An officer's decision to use deadly force is the most consequential decision they can make and the circumstances surrounding the use of deadly force demand a heightened scrutiny... After viewing them, I am left with many serious questions."

- Shammas Malik, Mayor of Akron
  December, 5, 2024 Statement following the killing of Jazmir Tucker

Plaintiff Ashley Green, individually and as Administrator of the Estate of Jazmir Tucker ("Jazmir"), Deceased ("Plaintiff"), by and through undersigned counsel, brings this Complaint against Defendants City of Akron, Ohio, Mayor Shammas Malik, Chief Brian Harding, Officer Davon Fields, Sergeant Kyle Farr, Sergeant Adam Guilmette, Sergeant D. Ray, Sergeant Joseph Woodin, and Officer Steven Loar and John Does Nos. 1-10 (collectively, "Defendants"), and makes the following allegations upon personal knowledge as to Plaintiff's own acts, upon information and belief, and Plaintiff's attorneys' investigation as to all other matters, and states as follows:

## I.  INTRODUCTION

1.      This action arises out of the tragic and senseless shooting death of Jazmir Tucker, an unarmed Black child, who was inexplicably shot on or about Thanksgiving Night 2024, in Akron, Ohio. This Complaint is filed pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution, as well as applicable Ohio wrongful death and tort statutes.

2.      Jazmir Tucker, just 15 years-old at the time of his death, was a son, a (twin) brother, a beloved family member loved by his family and friends. The community has been devastated by his death.

3.      Plaintiff alleges, without limitation, that Defendant Fields used excessive force when he

3

fatally shot Jazmir Tucker without justification on November 28, 2024, in Akron, Ohio.

4.     Plaintiff further alleges, without limitation, that Defendants City of Akron, Ohio, Mayor Shammas Malik, Chief Brian Harding, Sergeant Kyle Farr, Sergeant Adam Guilmette, Sergeant D. Ray, and/or Sergeant Joseph Woodin knew or reasonably should have known of, participated in, endorsed, condoned, and/or ratified the unconstitutional conduct of their subordinate, Defendant Davon Fields.

5.     The City of Akron has a long-standing policing problem that disproportionately impacts people of color.

6.     Akron Police Department's internal culture has long tolerated discriminatory attitudes, as demonstrated by the circulation of the "Signal 44" newsletter in the late 1990s, which contained openly racist content. See attached hereto as **Exhibit 1**.  This culture of bias and indifference to accountability has persisted, contributing to the systemic issues within the department.

7.     The culture of bias has manifested in over-policing, but less protection in communities of color.

8.     Since 2000, according to publicly available data, there have been more than 40 deaths in Akron involving Akron Police. Over half of those killed were Black, in a city where only 31% of the residents are Black.

9.     Plaintiff brings this action pursuant to 42 U.S.C. § 1983 for the deprivation of Jazmir Tucker's, clearly established rights as secured by the Fourth and Fourteenth Amendments to the United States Constitution.

10.     Plaintiff also brings this action pursuant to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), and its progeny.

## II.    JURISDICTION AND VENUE

11.    This Court has federal question subject matter jurisdiction, pursuant to 28 U.S.C. §§ 1331 and 1343, as this action is brought, pursuant to 42 U.S.C. § 1983, to redress a deprivation of constitutional rights as set forth herein.

12.    Venue is proper in this Court under 28 U.S.C. § 1391 because all incidents, events, and occurrences giving rise to this action occurred in the United States District Court for the Northern District of Ohio and, upon information and belief, all parties reside in this judicial district.

## III.    PARTIES

### A.    Plaintiff

13.    At all times relevant to this action, Plaintiff is/was a resident of the City of Cleveland, Cuyahoga County, Ohio.

14.    Plaintiff was appointed by the Summit County Probate Court as the Administrator for the Estate of Jazmir Tucker on February 20, 2025.

### B.    Defendants

#### *Officers Davon Fields and Officer Steven Loar*

15.    At all times relevant to this action, Defendants Davon Fields and Steven Loar were employed as police officers for Defendant City of Akron, Ohio, and are residents of Summit, Portage, and/or Trumbull County, Ohio.

#### *Supervisory Officers*

16.    Defendant Sergeant Joseph Woodin ("Defendant Sgt. Woodin") is a police officer employed by Defendant City of Akron, Ohio.  At the time of Jazmir Tucker's killing, he was a direct supervisor of Officer Davon Fields.

17.     Defendant Sergeant Kyle Farr ("Defendant Sgt. Farr") is a police officer employed by Defendant City of Akron, Ohio.   At the time of Jazmir Tucker's killing, he was a scene supervisor.

18.     Defendant Sergeant Adam Guilmette ("Defendant Sgt. Guilmette") is a police officer employed by Defendant City of Akron, Ohio. Prior to the arrival of investigators from BCI, Defendant Sgt. Guilmette was a supervisor at the scene of Jazmir Tucker's killing.

19.     Defendant Sergeant D. Ray ("Defendant Sgt. Ray") is a police officer employed by Defendant City of Akron, Ohio. Prior to the arrival of investigators from the Bureau of Criminal Investigation ("BCI"), Defendant Sgt. Ray was a supervisor at the scene of Jazmir Tucker's killing.

### *Chief of Police*

20.     Defendant Brian Harding ("Defendant Chief Harding"), at all times relevant herein, is Chief of Police for the Defendant City of Akron, Ohio.

21.     Pursuant to Section 68 of the Charter of the City of Akron, Defendant Chief Harding is in immediate charge of the Division of Police, has jurisdiction over the Police Station and any substation which may be established, and has control over the stationing and transfer of all patrolmen and other employees constituting the Division of Police, under such rules and regulations as the *Mayor.*

22.     Defendant, Shammas Malik ("Defendant Mayor Malik") at all times relevant herein is Mayor of the City of Akron, Ohio.

23.     Pursuant to Section 54 of the Charter of the City of Akron, the duties of Defendant Mayor Malik include, but are not limited to:

     a.     Seeing that the laws and ordinances of the City of Akron are enforced;

6

b.  Appointing and removing all employees in both the classified and unclassified service, except elected officials;

c.  Exercising control over all departments and divisions created by the Charter of the City of Akron or that may be created by Council; and

d.  Having the right to introduce ordinances and take part in the discussion of all matters coming before the City of Akron Council.

24.  Pursuant to Section 58 of the Charter of the City of Akron, the duties of Defendant Mayor Malik include, but are not limited to, causing the affairs of any department or the conduct of any officer or employee to be examined.

25.  Pursuant to section 68 of the Charter of the City of Akron, Defendant Mayor Malik is responsible for making all rules necessary for the regulation of the Department of Public Safety, which includes the Division of Police.

26.  Pursuant to Section 67 of the Charter of the City of Akron, Defendant Mayor Malik is responsible for making all rules necessary for the discipline of all employees within the Department of Public Safety, which includes police officers within the Division of Police.

### *The City of Akron*

27.  Defendant City of Akron, Ohio ("Defendant City") is a municipal corporation located in Summit County, state of Ohio.

28.  Defendant City is located at Municipal Building 166 South High Street, Suite 103, Akron, Ohio 44308.

29.  At all times relevant to this action Defendant City employed all Defendants and all Akron police officers identified herein.

30.  The City of Akron's Police Department's mission statement is as follows: "Our Mission

is to serve the community of Akron in a collaborative effort to enhance the quality of life through crime prevention, enforcement of laws, promotion of safety and reduction of fear."

31.    At all times relevant hereto, Defendant violated its mission statement and promises it made to the community of Akron.

32.    Redress is being sought from all Defendants in their official and individual capacities, and all Defendants were acting under and/or outside of color of law and/or pursuant to the policies, customs, and/or usages of the City of Akron.

33.    At all times relevant herein, Defendant(s) John Doe Nos. 1-10, whose names and addresses are unknown despite the exercise of reasonable diligence, are believed to be police officers, supervisors, commanders, and/or other administrative, police department, or City employees of Defendant City of Akron whose identities or involvement in the events giving rise to the claims asserted herein cannot be ascertained and/or discovered by Plaintiff at the present time, but whom, through conducting discovery, may become known as being persons properly included as Defendants in this matter.

34.    At all times relevant hereto, Mayor Shammas Malik, Chief Brian Harding, Officer Davon Fields, Sergeant Kyle Farr, Sergeant Adam Guilmette, Sergeant D. Ray, Sergeant Joseph Woodin, and John Does Nos. 1-10 shall be referred to, from time to time, as the "Supervisory Defendants," as set forth below.

### IV.    <u>STATEMENT OF FACTS</u>

35.    All preceding paragraphs are incorporated as if fully re-written herein.

36.    The Akron PD violent culture addressed above was on full display on November 28, 2024.

37.    The misconduct of Defendant City of Akron has been systemic and on-going for many

years prior to and through November 28, 2024.

38.    On November 28, 2024, Defendants Fields and Loar, were in their patrol car behind Antioch Baptist Church located at 670 Vernon Odom Boulevard when they allegedly heard "what sounded like a gunshot" coming from their southwest location.

39.    Defendant Fields initially believed the noise to be a firework until allegedly hearing a second shot before Defendant Fields grabbed his rifle and before formulating any joint conclusions or plan, exited the vehicle, leaving Loar behind.

40.    Defendant Loar grabbed his rifle and began following Defendant Fields before realizing they had both left their patrol car unlocked.

41.    Neither officer activated their body-worn cameras when they exited the cruiser, despite Akron Police Department ("APD") policy requiring activation in enforcement encounters. Their cameras were instead activated automatically later by the system's pre-event buffer.

42.    Shortly after exiting their vehicle, the officers encountered Jazmir on foot in the neighborhood.

43.    At no point did any Defendant ever see Jazmir brandishing, pointing, or firing a weapon toward any person or at all.

44.    As a result of Fields and Loar's failure to activate their body-worn camera, the body-worn camera footage begins with no audio for approximately 30 seconds, which encompasses the time during which the officers run toward Jazmir, raise their rifles, and Fields fired the shots that killed him.

45.    There is no video or objective evidence which shows Jazmir brandishing, pointing, or firing a weapon at officers prior to being shot and killed by Defendant Fields.

46.    During the encounter, Fields fired eight rounds from his rifle at Jazmir over the course of

roughly three seconds.

47.     After being shot, Jazmir collapsed to the ground and  immediately became unresponsive.

48.     Once audio begins on the body-cam, despite Jazmir having been fatally shot, officers can be heard repeatedly yelling commands at the unresponsive teen to "show [or raise] your hands", even though he had already been shot and was lying on the ground.

49.     Multiple officers eventually converged on Jazmir. before handcuffing him while he lay gravely wounded, and despite his need for medical aid, only then searching his clothing.

50.     Jazmir was not found to have been holding any weapon, nor was there any weapon on the ground near him. Instead, after first unzipping Jazmir's jacket pocket, and desperately searching Jazmir's pocket, again instead of rendering medical aid, officers eventually found a handgun.

51.     At least seven (7) minutes passed before any APD officer began administering any medical aid.

52.     Defendant Mayor Malik publicly described the amount of time that elapsed between the shooting and the initiation of physical aid as "deeply troubling" and stated that any unreasonable delay in rendering aid by officers is unacceptable and has no place in Akron.

53.     Emergency medical services ultimately transported Jazmir from the scene to a local Akron hospital, where he was pronounced dead from his injuries.

54.     The Summit County Medical Examiner's Office determined that Jazmir suffered three gunshot wounds—including at least two entrance wounds to his back and one to his arm—with a bullet path that damaged his heart and lung.

55.     The Medical Examiner ruled the cause of death to be gunshot wounds to the torso and the manner of death to be homicide.

56.     Fields, the officer who killed Jazmir, had serious deficiencies in his training and was

essentially a ticking time bomb.

57.    Defendants, City of Akron and Akron Police Department knew that training as it relates to Fields and his ultimate violent engagement with Jazmir was inevitable.

58.    Field's training record is overwhelmingly dominated by courses providing training in high-risk, military-style encounters. They include courses of multi-hour blocks leading up to and notably from 2023-2024, such as:

      a.    SWAT Firearms

      b.    SWAT Tactical

      c.    Rifle, pistol, shotgun qualifications

      d.    Night Vision Goggle tactical operations

      e.    Woodland operations, gas mask operations, HRT/IRT, barricade operations, tubular and vehicle assaults

59.    Fields' training is unfortunately (but predictably) deficient in de-escalation, ordinary patrol policing or dealing with juveniles, the mentally ill, unarmed subjects, or fleeing suspects.

60.    Fields' training environment was oriented toward high-threat "shoot/no-shoot" framing which clearly increased the risk of Fields' lethal escalation.

61.    Over 80% of Fields' training hours in 2023 and 2024 were in SWAT, firearms, tactical or weapons qualifications. He completed over 25 entries of firearms/SWAT training in 2023-2024 alone compared to ZERO entries for implicit bias, adolescent brain development, trauma-informed policing or proportionality standards.

62.    Fields' spent years operating without robust de-escalation preparation, despite being placed by Akron PD and City of Akron in high-intensity deployments and firearms-heavy training cycles.

63.     Notably, Defendant Fields' training record appears to include only one explicitly titled "Use of Force" course which occurred on November 3, 2022 for four hours. This is notable because Akron PD use of force policy underwent heightened scrutiny after the 2022 killing of Jayland Walker.

64.     Fields' training record shows no force related refresher or updates in 2023 or 2024 before he shot and killed Jazmir Tucker.

65.     Law enforcement practices and procedures generally require annual use of force recertification, legal update, duty to intervene training, tactical communication and de-escalation.

66.     Fields' training does not reflect such annual or biannual updates.

67.     Fields' overall "warrior-style" training without compensating de-escalation training created a foreseeable reckless risk of defaulting to lethal force under stress.

68.     These training deficiencies were directly reflected in Fields' actions during his encounter with fifteen-year-old Jazmir Tucker on November 28, 2024, including his:

     a.     immediate escalation to a rifle,

     b.     failure to manually activate his body camera,

     c.     failure to employ tactical slowing or de-escalation,

     d.     use of repeated lethal shots at a fleeing child,

     e.     and significant delay in rendering medical aid.

69.     Defendants, City of Akron, Mayor Malik and Chief Harding's failures to train, supervise, and equip its officers were a significant moving force behind fatal shooting of Jazmir Tucker.

## V.     VIOLATIONS OF AKRON POLICE DEPARTMENT
## USE OF FORCE POLICY

**A.     Failure to Activate Body-Worn Camera in Violation of Policy**

70.     All preceding paragraphs are reincorporated as if fully rewritten herein.

71.     Akron Police Department ("APD") policy requires officers to **manually activate** their body-worn cameras ("BWC") at the initiation of any investigative detention, pursuit, or potentially dangerous encounter.

72.     Fields and Loar violated APD policy by failing to manually activate  BWC prior to confronting and shooting fifteen-year-old Jazmir Tucker.

73.     Fields admitted that he believed his camera activated automatically as a result of another cruiser's emergency lights and that, had he activated it properly, the 30-second pre-event buffer would have included audio.

74.     As a result, the moment of the initial encounter—when commands were allegedly given and force escalated—was not captured on audio, in direct violation of APD policy requiring full documentation of force events.

**B.     Failure to Use Required De-Escalation Techniques**

75.     APD policy mandates the use of de-escalation techniques whenever feasible, including maintaining distance, giving sustained verbal commands, slowing the pace of the interaction, and avoiding unnecessary escalation.

76.     Officers Fields and Loar violated APD de-escalation standards when they immediately confronted Tucker with rifles drawn, despite having no confirmed information that Jazmir possessed a firearm.

77.     Officers gave only a single verbal command ("show me your hands") before initiating a foot pursuit and escalating to deadly force within seconds, without any attempt at tactical

slowing or dialogue.

78.     APD's Use of Force  ("UOF") policy requires officers to avoid creating or worsening the danger. Fields' decision to immediately deploy a rifle and close distance heightened the risk and violated APD's de-escalation mandate.

**C.     Use of Deadly Force Without an Immediate Threat**

79.     APD policy prohibits the use of deadly force unless the officer reasonably perceives an immediate threat of death or serious bodily harm.

80.     No evidence in any BWC, witness interview, or officer statement establishes that Jazmir brandished a weapon, pointed a weapon, threatened officers, or made movements consistent with drawing a firearm prior to being shot.

81.     Civilian eyewitnesses consistently reported that they did not observe anything in Jazmir's hands and heard no gunfire prior to the officers firing.

82.     Officer Fields admitted that Jazmir's hand movement was consistent with "pulling up baggy pants" and that such a movement "is not the same as drawing a firearm."

83.     Despite the lack of an imminent threat, Officer Fields fired eight (8) rifle rounds at  the fleeing juvenile, striking him multiple times, including in the back.

84.     The use of deadly force against a fleeing suspect—particularly a juvenile—who poses no immediate threat is a clear violation of APD's deadly force policy.

**D.     Improper Tactical Decision-Making in Violation of APD Policy**

85.     APD training and UOF policies  require officers to use appropriate tactics, including maintaining cover, distance, and avoiding unnecessary foot pursuits that create heightened risk.

86.     Officers Fields and Loar initiated a rapid foot chase with rifles—tactical weapons that significantly restrict mobility—and immediately closed distance on Jazmir without assessing

backdrop, cover, or safer alternatives.

87.     The officers' decision to immediately pursue and engage Jazmir, rather than contain, assess, or utilize available patrol vehicles and lighting, constituted a violation of APD's tactical guidelines.

**E.     Failure to Render Immediate Medical Aid**

88.     APD policy requires officers to render medical aid "as soon as safely possible" after any use-of-force incident.

89.     Multiple witnesses reported that officers held Jazmir at gunpoint and formed a line for an extended period before rendering aid and that officers did not perform CPR.

90.     Body-worn camera footage confirms that officers waited for ballistic shields before approaching Tucker, despite Jazmir being incapacitated and alone.

91.     The delay in providing medical assistance violated APD's duty-of-care and post-force medical requirements.

**F.     Failure to Properly Document and Accurately Report the Incident**

92.     APD policy requires accurate documentation and reporting after any use of force.

93.     Officer Fields initially misreported the number of shots fired, believing he fired "3 to 5" rounds, but body-camera review revealed he fired eight (8)  rifle shots.

94.     Officers failed to check the lower parking lot for potential victims immediately, despite believing shots originated there. This violates APD's scene-safety and investigative responsibility directives.

95.     The failure to accurately articulate the threat, preserve evidence, and follow reporting procedures constitutes an additional policy violation.

## CLAIMS ALLEGED

## COUNT I
**(Excessive Force)**

96.     All preceding paragraphs are incorporated as if fully re-written herein.

97.     This claim is brought pursuant to Title 42 U.S.C. § 1983.

98.     Title 42 U.S.C. §1983 states, in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."

99.     The Fourth Amendment to the United States Constitution states, in relevant part, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ."

100.    For decades, the United States Supreme Court has interpreted the Fourth Amendment to the United States Constitution to prohibit a police officer's use of excessive force during the arrest of an unarmed, fleeing citizen. *See, e.g., Tennessee v. Garner*, 471 U.S. 1, 2 (1985).

101.    While acting under color of state law, Defendant Fields deprived Plaintiff of his well-established right to be free from excessive force, pursuant to the authority cited herein.

102.    At all times relevant to this action, Plaintiff asserts Jazmir had the well-established constitutional right not to be subjected to excessive force while being arrested, even if his arrest could have otherwise been proper.

103.    In other words, even if one were to ignore the fact that Jazmir had not been observed to have committed any crime on November 28, 2024, Defendant Fields was only permitted to use

16

the amount of force necessary under the circumstances to arrest Jazmir.

104.    At all times relevant to this matter, Defendant Fields was clothed with the authority of the state and misused that authority.

105.    On November 28, 2024, Officer Fields shot and killed Jazmir Tucker without legal justification, without probable cause, and in the absence of any immediate threat, in violation of clearly established Fourth Amendment law.

106.    No witness saw Jazmir holding or pointing a firearm, and multiple civilian eyewitnesses stated they observed nothing in Jazmir's hands at any time.

107.    Officer Fields admitted that the hand movements he observed were consistent with "pulling up baggy pants" and not the same as drawing a firearm, and he had no visual confirmation that Jazmir possessed a weapon before firing eight (8)  rifle rounds.

108.    Fields fired at a fleeing child, striking him multiple times, including in the back—conduct expressly forbidden absent an immediate threat.

109.    The body-worn camera footage shows no sudden aggressive action by Jazmir, no weapon brandished, and no movement reasonably interpreted as an imminent attack. The firing officer's BWC was not properly activated, leaving the most critical moments undocumented in violation of APD policy.

110.    The use of deadly force under these circumstances was objectively unreasonable, excessive, and in violation of the Fourth Amendment.

111.    Reasonable officers would have used verbal de-escalation, distance, non-lethal tactics, or containment—especially when encountering a juvenile.

112.    Officers Fields and Loar gave only a brief command ("show me your hands") before initiating a foot pursuit and escalating to deadly force within seconds, contrary to nationally

accepted police standards and APD's own Use-of-Force policy.

113.     These actions violated Jazmir's clearly established Fourth Amendment rights.

114.     After shooting Jazmir, officers failed to provide medical aid for several minutes, despite policy requiring aid "as soon as safely possible."

115.     Witnesses observed officers standing over Jazmir with guns drawn for an extended period while failing to perform lifesaving CPR.

116.     This delay demonstrated deliberate indifference to Jazmir's serious medical needs and further violated the Fourth Amendment.

117.      As a direct and proximate result of Defendants' wrongful actions, as set forth above, Plaintiff has been damaged, including but not limited to, Jazmir, Plaintiff's son, being  shot and killed, her family was destroyed, and she has endured pain, anguish, embarrassment, humiliation, feelings of powerlessness, harm to self-esteem, emotional distress, fear, anxiety, loss of sense of personal safety, dignity, and legal fees and costs.

118.     As a direct and proximate result of Defendant Fields' unconstitutional conduct, Jazmir suffered severe pain, conscious suffering, bodily injury, and death, and his Estate suffered losses recoverable under federal and state law.

## COUNT II
### (Supervisory Liability)

119.     All preceding paragraphs are incorporated as if fully re-written herein.

120.     This claim is brought pursuant to Title 42 U.S.C. § 1983.

121.     The Supervisory Defendants is/are the direct supervisors of Defendants Fields and Loar.

122.     The Supervisory Defendants have supervisory authority over the Akron Police Department and/or Defendant Fields.

123.     At all times relevant to this action, the Supervisory Defendants knew or reasonably

should have known of, and/or participated in, and/or condoned, and/or ratified:

    a.    Defendant Fields' shooting at Jazmir when he posed no risk of lethal harm to any officer or civilian because he was not pointing a weapon at or threatening any officer at the time he was shot;

    b.    Defendant Fields' shooting at Jazmir when he posed no risk of lethal harm to any officer or civilian and Fields had a clear line of sight and clear picture that Jazmir was not brandishing, aiming or threatening him or any other officer.

    c.    Defendant Fields' shooting and other Defendants reckless tactical conduct as it relates to Jazmir Tucker created a scene, rife with rule-breaking, chaos, and violence, as they ignored their own policies and procedures;

    d.    Defendants, including, but not limited to Defendant Fields, failed to de-escalate the scene, thereby making the scene more dangerous to Jazmir, the officers, and the general public;

    e.    Defendants' tactical decisions against Jazmir before they engaged him and when he appeared to run from officers; and

    f.    Defendant Fields' use of lethal force while facing no threat of lethal force as Jazmir was running away from him with his empty hands plainly visible;

124.   The Supervisory Defendants knew or reasonably should have known that their acts and/or failures to act would likely cause the constitutional injury that befell Plaintiff and Jazmir, to wit: by endorsing, promoting, encouraging, and/or not disciplining Defendant Fields', and/or by keeping him employed at the City, and/or by  allowing  him to continue to use his  firearms as a police officer under the circumstances detailed in this Complaint, Jazmir was killed and Plaintiff lost her son as a result of Defendant Fields' reckless, wanton, and/or willful actions which were

endorsed, condoned, and/or ratified by Defendants.

125.    The Supervisory Defendants had a duty and/or were required by his/their training to take action to discipline and/or otherwise prevent Fields and/or the other Defendants from engaging in the above-stated conduct.

126.    Despite his/their knowledge of Defendant Fields' misconduct, as stated above, the Supervisory Defendants took no action, failed to impose reasonable discipline, failed to follow chain of command, failed to document the instances of misconduct, and/or otherwise abandoned his/their supervisory duties.

127.    As a result of his/their failures and/or abandonment of his/their supervisory duties as stated above, the Supervisory Defendants created an environment that  condoned the aforementioned misconduct and perpetuated and/or facilitated and/or aided Defendant Fields in the unreasonably violent and grotesque seizure of Jazmir's person and the taking of his life when he posed no lethal threat to Defendants or anyone else at the time he was killed.

128.    The Supervisory Defendants engaged in acts and omissions that were the product of a reckless or callous indifference to Jazmir's and Plaintiff's constitutional rights, to wit:

      a.    Defendants trained, endorsed, and/or condoned Defendant Fields to shoot at subjects in the manner detailed above, i.e., when the subject posed no direct threat to them or the life of another;

      b.    The Supervisory Defendants knew or had reason to know that at least Defendants Fields, Loar, and other responding Defendants coordinated their stories on or about the night of Jazmir's shooting with the assistance and coaching of their police union leadership and the assistance of Defendants to create an artificial narrative of the events of November 28, 2024, all to protect Defendants from civil

or criminal liability; and

Despite having the aforesaid knowledge, Defendants continue to condone the conduct and actions of the Defendants as stated above.

129.    By their acts and failures to act as stated above, the Supervisory Defendants in fact caused Plaintiff's constitutional deprivation: to wit, Jazmir was seized/killed with lethal force while running from them unarmed in violation of the 4th and 14th Amendments to the United States Constitution.

130.    As a direct and proximate result of Defendants' actions, as set forth above, Plaintiff has been damaged, including but not limited to Jazmir, Plaintiff's son, was shot and killed, her family was destroyed, and she has endured pain, anguish, embarrassment, humiliation, feelings of powerlessness, harm to self-esteem, emotional distress, fear, anxiety, loss of sense of personal safety, dignity, and legal fees and costs.

## COUNT III
### (Municipal Liability pursuant to *Monell*)

131.    All preceding paragraphs are incorporated as if fully re-written herein.

132.    This claim is brought pursuant to Title 42 U.S.C. § 1983.

133.    Defendants Mayor Malik and/or Supervisory Defendants is/are the top policymakers for the City of Akron Police Department.

134.    Defendant City of Akron maintains an armed police force, the Akron Police Department, with the power to arrest citizens.

135.    The City of Akron ("the City"), through its policymakers, maintained a systemic failure to train its officers—including Officer Davon Fields—in constitutional limits on the use of force, including de-escalation, proportionality, tactical slowing, threat assessment, and safe encounter management, particularly with juveniles and unarmed or possibly armed fleeing subjects.

21

136.    Officer Fields' training record shows that, between 2020 and 2024, Akron provided him minimal and sporadic use-of-force instruction, consisting of only one four-hour blocks of "Use of Force" training in November 2022, with no documented annual refreshers in 2023 or 2024.

137.    During that same period, Akron subjected Fields to overwhelmingly heavy weapons and SWAT-style tactical training, including dozens of hours of rifle, pistol, shotgun, and nighttime tactical operations training, creating an officer conditioned to engage encounters through a high-threat, warrior-style lens rather than through constitutional policing.

138.    Akron failed to provide Officer Fields with meaningful or recurring training in:

    a.      de-escalation principles

    b.      ICAT-based tactical slowing (provided only weeks before the shooting)

    c.      adolescent behavior or juvenile threat perception

    d.      crisis intervention

    e.      duty to intervene

    f.      body-worn camera activation requirements

    g.      proportional force and tactical disengagement

    h.      rendering timely medical aid after force events

139.    As a result of these training inadequacies, Akron officers—including Fields—were not equipped to safely resolve encounters without resorting to deadly force, even where the subject was a child, fleeing, or not actively posing an immediate deadly threat.

140.    Akron has a well-established and widely publicized pattern of officer-involved shootings and force incidents, including multiple fatalities in the years immediately preceding Jazmir's death—among them the shootings of Jayland Walker (2022) and Michael Donnell Jones (2024)—demonstrating that the City was on notice of repeated failures in officer decision-

making.

141.    Defendant City of Akron is aware that its officers engage in violent behavior that involves excessive force in violation of the Fourth Amendment which disproportionately involves African Americans, to wit:

a.    The excessively forceful and violent and lethal arrest of Michael Jones, 54 years-old, in August of 2024, a black male who was shot by Akron police officers during a tactically deficient investigatory stop of Jones while he was sitting in a U-Haul truck;

b.    The excessively forceful and violent and lethal arrest of Jayland Walker on June 27, 2022, an unarmed black male who was shot by 8 Akron police officers  while running away, following a minor traffic violation (unlit license plate and cracked taillight) and pursuit;

c.    The excessively forceful and violent arrest of Charles Hicks II on February 7, 2021, an unarmed black male who was arrested with an officer's knee near his neck while the officer smothered his mouth and nose with snow as he lay on the ground following his refusal to leave the porch area of his home;

d.    The excessively forceful and violent arrest of Elijah Cade on January 7, 2020, an unarmed black male who was shot by Akron Police officers following a minor traffic violation (no visible license plate) and pursuit;

e.    The excessively forceful and violent arrest of Patrick King on October 21, 2018, an unarmed white male who was tased, knocked to the ground, and punched while on his stomach for refusing to identify himself;

f.    The excessively forceful and violent arrest of Jamon Pruiett and LaTrent Redrick

on October 1, 2017, two Black males with no prior criminal records who were shot by an Akron police officer while standing outside of aa downtown area nightclub and making no threat toward any officer;

g. The excessively forceful and violent arrest of Dr. Dale Leonhardt on December 5, 2015, an unarmed male whose arm was broken by an Akron police officer following a minor traffic violation (failing to come to a full stop prior to turning right at a traffic light);

h. The excessively forceful and violent arrest of Tamika Williams on October 26, 2012, an unarmed Black 13-year-old girl whose arm was broken by an Akron school resource officer after he put her arm behind her back, pushed her face-first into lockers, and lifted her off the ground.

142. On or about May 27, 2020, over four years before Jazmir Tucker was killed, former Akron mayor Dan Horrigan posted on the official Akron Mayor Facebook account: "When black people are disproportionately targeted and killed by police officers, racism is an absolute factor. Historically, Black people have been targets of violence by law enforcement."

143. Despite this pattern, the City did not materially adjust its use-of-force training curriculum, did not institute mandatory annual constitutional policing modules, and did not retrain officers on proportionality or de-escalation, instead continuing to prioritize weapons and SWAT-style training even for non-SWAT patrol personnel.

144. This is evidenced by another tragic shooting which occurred less than two weeks before the filing of this Complaint, almost one year exactly after the murder of Jazmir. On November 11, 2025, another Akron police officer shot an unarmed 36 year-old Black man eight times during an encounter near Albrecht Avenue and High Grove Boulevard.

145.    This incident again raises public concerns about APD's failure to properly identify threats, reliance on lethal force in response to ambiguous movements, and its patter of deploying officers who escalate encounters without confirming the presence of a weapon.

146.    Akron's policymakers, including, but not limited to, Defendant City of Akron, Defendant Mayor Malik, and Defendant Chief Harding were deliberately indifferent to the known and obvious consequence that officers trained primarily in firearms and tactical assault courses, and rarely in de-escalation or force-limitation tactics, would foreseeably engage in unconstitutional uses of deadly force.

147.    The failure to train was closely related to and the moving force behind the unconstitutional shooting and killing of fifteen-year-old Jazmir Tucker.

148.    Defendant City of Akron has a long-standing and unwritten policy or custom of shielding officers from consequences for their use of excessive force and/or ignoring the use of excessive force on citizens during arrests, to wit:

    a.    The City is known to offer lawsuit waivers in exchange for dropping the charges against individuals who are subjected to excessive force during their arrest;

    b.    The City accepts excessive force as a condition of police work at the City of Akron, to the extent that officers are trained and aided on how to avoid prosecution for their violent actions by re-phrasing and artfully summarizing their violent actions and encounters with citizens in police documentation;

    c.    For years, Akron mayors, including, Defendant Mayor Malik, have acquiesced to a culture of violence in the Akron Police Department by abandoning his duty under the Charter of the City of Akron to exercise control over the Police Department and by avoiding any study of the number of excessive force cases and

violence involved in the arrest of citizens within the City of Akron;

d.      For years prior to Jazmir Tucker's death, Defendants have  fostered and condoned a culture of violence in the Akron Police Department by abandoning their duty under the Charter of the City of Akron to remove police officers and/or exercise control over the Police Department by allowing city employees to restrict and/or interfere with and/or hamper the oversight activities of the Office of the Police Auditor; and/or

e.      For years prior to Jazmir Tucker's death, Defendant Mayor Malik has perpetuated a culture of violence in the Akron Police Department by permitting officers who have engaged in excessive force or unreasonable violence toward citizens to avoid the consequences of discipline or criminal investigation by allowing them to simply retire.

149.   The unwritten policy and/or custom stated in the immediately preceding paragraphs is/are known to the Defendant Mayor Malik and Supervisory Defendants, who approved, benefitted from, ratified, encouraged, sanctioned, and/or promoted this policy or custom throughout the Akron Police Department.

150.   Following the death of Jazmir Tucker, the Supervisory Defendants and Defendant Mayor Malik continue to approve, ratify, encourage, sanction, and/or promote the policy or custom of ignoring excessive force and fostering a culture of violence as they expressed support for the Defendant Fields' actions regarding the death of Jazmir, imposed no discipline on the Defendant Fields, and have changed none of the training at Defendant City Akron.

151.   Defendant City of Akron also maintains an unwritten policy or custom of fostering racist and violent ideas and attitudes towards African Americans within the City of Akron, to wit:

a.      Officers currently employed at the City of Akron participated, read, received, circulated, or found humorous a newsletter, titled, "Signal 44 (PBS to Air a New Wildlife Documentary)." Attached as **Exhibit 1**.

b.      The newsletter contained the following quotes and statements in reference to how citizens within the City of Akron are treated by officers:

i.      It referred to officers as "District 20's resident game wardens."

ii.     It referred to District 20 as a "preserve" from the following portion: "chasing down a young male of the Snyder area of the preserve where they hoped to catch the young species and tag him so his predatory activities can be tracked (note to camera man, edit out the rabbit punches."

iii.    "Officer delivers 15 closed fist abdominal thrusts. The officer applies the forearm/bicep torniquet to the victim's neck which proves successful. The young male falls completely unconscious. They work quickly to complete the summons and staple it to the young male's forehead."

iv.     "Next the officers respond to a downed female. She appears to be clubbed on the head. As the pair studies the female, they quickly discount the theory that the injury was a result of a mating ritual. Primarily because the injury was caused by a 40oz bottle, which usually denotes hostility, whereas the 22oz longneck bottle usually indicates affection during the courtship process. The bright young officers note that the female is still carrying 76$ [sic] in food stamps, indicating that scavengers roaming the preserve have not yet discovered the easy prey. An 18 year old cub of the downed female, wanders onto the scene and begins screaming hysterically.

Ofc. McFarland, a skilled linguist, translates. The female cub states that a lone male that occasionally visits the brood did this. The female cub, states that the violent male did not sire her but she later admits that he is the donor responsible for 2nd sister and 4th brother. In an effort to calm her down, Ofc's Male and McFarland arrest her for her outstanding warrants."

v. "The officers explain that the male species in district 20 are not that different from males in any other part of the city. They too, crave female companionship. Usually the first of each month (unless that falls on a Sunday, in which case the checks come the next day). They also feel the desire to break away from the family heard occasionally. Usually the second day of each month. At this time, they climb into their primitive conveyance. (Usually an Oldsmobile product circa 1977-1985). They then attempt to drown out the whining of their numerous offspring by playing some fucking bass-driven noise at a decibel level so high that it causes the inner-ear to bleed." vi. Another portion of the newsletter reads: "The man will jump out of the back window, jump a fence into the pen of three Rottweilers … his death will mean he can no longer smoke crack … this in turn means over his lifetime, he will not break off 1109 antennas off of Oldsmobiles."

vii. "Then came the Uzis. This too was bad. The combatants would spray thousands of rounds, missing each other but shooting up a busload of blind, one-legged kids going to Chemotherapy Camp who happened to be driving by. Then came the shotguns. This was good. One combatant would

be killed and the other would be arrested and go to jail. Then the male that sold them both their guns would take over."

c.   According to the findings of an Internal Affairs inquiry that occurred at the time of the newsletter's discovery in 1998, <u>currently employed veteran police officers</u> (emphasis added) expressed support (or no offense) regarding its contents, to wit:

    i.   Officer Clay Cozart, currently employed at the City of Akron's Police Department as a detective – while also being the current president of the Fraternal Order of Police, Lodge #7 – was interviewed and said at the time he was not offended that his name was in the newsletter and added that publicity about the subject was "unfair."

    ii.   Officer Brian Simcox, currently a Lieutenant at the City of Akron's Police Department, said at the time he was not offended that he appeared in the newsletter and thought its contents was "hilarious."

    iii.   Officer Brian Harding, currently a Deputy Chief at the City of Akron's Police Department, said at the time that he was not offended at appearing in the newsletter, felt the newsletter had no adverse effect on the shift, and thought the contents of the newsletter were "funny."

d.   The officer who authored the content of the aforesaid newsletter, Terry Pasko, remained employed with the City of Akron as a police officer until 2019, when he retired as a Captain.

152.   No officer was fired for their involvement in the Signal 44 newsletter.

153.   None of the officers who expressed being humored by the newsletter were disciplined.

154.   None of the officers who expressed no offense at being named in the newsletter were

disciplined.

155.    By virtue of the Internal Affairs investigation and public reporting on the subject at the time, the Defendant City and Defendant Mayor Malik have knowledge of the Signal 44 newsletter and its contribution to the culture of violence and racism at the City of Akron's Police Department. To date, Defendant City has never initiated any meaningful disciplinary proceedings, policy reviews, or culture reforms since the discovery of the Signal 44 Newsletter as it refers to excessive force against African Americans within the City of Akron Police Department.

156.    The aforesaid unwritten policies or customs put Jazmir, Plaintiff, and the general public at unreasonable risk of grievous bodily harm, injury, or death.

157.    The aforesaid unwritten policies or customs as shown by the pattern of unreasonably violent cases listed above and reinforced by the lack of meaningful discipline following the discovery of the Signal 44 newsletter did in fact cause the death of Jazmir.

158.    At all times relevant hereto, the Defendant Mayor Malik and Supervisory Defendants initiated, authorized, condoned, ratified, and/or encouraged the aforesaid unwritten policies or customs.

159.    Defendant Mayor Malik and Supervisory Defendants had knowledge of the aforesaid unwritten policies or customs because they worked at the City of Akron at the time the aforesaid policies or customs were in place.

160.    The Supervisory Defendants reviewed documents, discussed, and/or received details and information at the Akron Police Department about the manner in which the Defendant Fields shot and killed Jazmir while he was running from them unarmed.

161.    By their actions and failures to act as aforesaid, Defendant Mayor Malik and the Supervisory Defendants approved of the Defendant Fields' conduct.

30

162.     Defendant Mayor Malik and the Supervisory Defendants were thus on actual and/or constructive notice of these policies or customs but did nothing about them.

163.     We should take the Defendant Mayor Malik's own words into account in determining whose responsible for the failed training and overaggressive police force:

> **"We can't control every factor in volatile, high-risk situations. But we can control how we prepare our officers, how we train them, and how we equip them to de-escalate, make sound decisions under pressure…"**
>
> - Shammas Malik, Mayor of Akron
>   November 18, 2025 Statement following the shooting of Corey Phillips

164.     Upon information and belief, Defendant City of Akron does not train its police force on bias-free policing or law enforcement vehicular pursuits, to wit:

    a.     In Executive Order 2015-04K, the Governor for the State of Ohio established the Ohio Collaborative Community-Police Advisory Board, to establish trust with citizens and law enforcement and explore and strengthen fractured relationships between the two.

    b.     The purpose of the Ohio Collaborative Community-Police Advisory Board was to set state-wide minimum standards for State and local law enforcement.

    c.     The Ohio Collaborative Community-Police Advisory Board encouraged law enforcement agencies to adopt model departmental policies and best practices, but Defendant City of Akron has failed to do so.

    d.     In fact, Defendant City of Akron is one of the Ohio cities that has never met the criteria for the Ohio Collaborative Law Enforcement Certification regarding biasfree policing.

    e.     Defendant City of Akron is one of the Ohio cities that has never met the criteria for the Ohio Collaborative Law Enforcement Certification regarding vehicle

31

pursuits.

165.    The subsequent use of force incident less than two weeks before this filing further establishes that Akron's unconstitutional training and supervision deficiencies were not aberrational or confined to a single officer, but instead reflect a systemic failure and a predictable result of the City's deliberate indifference. Jazmir's death is not an isolated tragedy, but part of a longstanding pattern in which Akron officers repeatedly use deadly force against individuals— frequently Black residents—under circumstances where no immediate threat is present.

166.    Upon information and belief, Defendant City of Akron does not discipline officers, such as Defendant Fields, who shoot and/or kill persons, like Jazmir, who run from officers on foot.

167.    Upon information and belief, Defendant City of Akron does not discipline officers, such as the Defendant Fields, who fail to deescalate situations where persons, like Jazmir, run from officers on foot.

168.    As a direct and proximate result of Defendants' actions, as set forth above, Plaintiff has been damaged, including but not limited to, Jazmir, Plaintiff's son, was shot and killed, her family was destroyed, and she has endured pain, anguish, embarrassment, humiliation, feelings of powerlessness, harm to self-esteem, emotional distress, fear, anxiety, loss of sense of personal safety, dignity, and legal fees and costs.

## <u>COUNT IV</u>
**(State Law- Wrongful Death and Excessive Force Under Ohio Law/R.C. 2744.03(A)(6)(b)-Against Officer Fields)**

**A.    Officer Liability Despite Statutory Immunity**

169.    All preceding paragraphs are incorporated as if fully re-written herein.

170.    Under R.C. 2744.03(A)(6), an Ohio police officer is not immune from liability when his actions are performed:

    a.      with malicious purpose,

    b.      in bad faith, or

    c.      in a wanton or reckless manner.

171.  "Reckless" conduct includes actions taken with conscious disregard of a known or obvious risk of harm that is unreasonable under the circumstances.

**B.**    **Reckless Use of Deadly Force**

172.  Officer Fields' actions in shooting and killing fifteen-year-old Jazmir Tucker were reckless, wanton, and in conscious disregard of a known risk, because:

    a.      Fields discharged eight (8) rifle rounds at a fleeing juvenile without confirming the presence of a weapon.

    b.      No witness observed a weapon, and Fields himself admitted Jazmir's movements were consistent with innocent behavior.

    c.      The officer used a high-powered rifle in close-range pursuit conditions, creating a substantial risk to the child and to the public.

    d.      Fields failed to follow APD de-escalation policy, tactical training, and body-worn camera activation procedures.

**C.**    **Reckless Failure to Render Aid**

173.  Officers recklessly delayed rendering medical aid—standing over a gravely wounded teen for several minutes—despite policy requiring prompt assistance and despite Jazmir posing no ongoing threat.

174.  Such delay demonstrated wanton disregard for Jazmir's survival, violating Ohio law and APD policy.

**D.  Wrongful Death**

175.  As a direct and proximate result of Officer Fields' reckless and wanton conduct, Jazmir Tucker suffered fatal gunshot wounds and died, causing damages recoverable under R.C. 2125.

176.   As a direct and proximate result of the reckless and wanton conduct of the Defendants, as aforesaid, Jazmir Tucker died on November 28, 2024.

177.   As a direct and proximate result of the wrongful conduct of the Defendants, jointly and severally, as aforesaid, the decedent's mother, father, twin brother and other next-of-kind, have been deprived of the decedent's loss of support, loss of services, loss of society, loss of companionship, loss of consortium, loss of care. loss of assistance, loss of attention, loss of protection, loss of advice, loss of guidance, loss of counsel, loss of instruction, loss of training, loss of education, loss of prospective inheritance, and have suffered emotional trauma and mental anguish by reason of the wrongful death of the decedent.

178.   Plaintiff has incurred funeral expenses in an amount et to be determined by reason of the wrongful death of decedent.

179.   Because Defendants acted recklessly and wantonly, he is not entitled to immunity under R.C. 2744.03(A)(6), and Plaintiff is entitled to compensatory damages, punitive damages, and all other relief available under Ohio law.

**<u>COUNT IV</u>**
**(R.C. 2305.21- Survival Action)**

180.   All preceding paragraphs are incorporated as if fully re-written herein.

181.   Pursuant to Ohio Revised Code § 2305.21, all causes of action for injuries to the person survive and may be brought by the personal representative of the decedent's estate.

182.   Prior to his death on November 28, 2024, Jazmir W. Tucker, age 15, suffered severe physical pain, conscious suffering, emotional distress, fear, and terror as a result of being

34

pursued, shot multiple times with a police rifle, and left without immediate medical attention by the Defendant Officers.

183.    The body-worn camera footage and witness statements demonstrate that after being struck by gunfire, Jazmir lay conscious, gravely wounded, and unassisted while officers maintained a tactical perimeter instead of providing lifesaving aid.

184.    Witness testimony confirms that officers continued issuing commands and pointing weapons at Jazmir even though he was already shot, incapacitated, and on the ground, further increasing his pain, fear, and emotional trauma in the final moments of his life.

185.    The forensic evidence indicates that Jazmir suffered multiple gunshot wounds— including wounds to his torso and back—causing significant internal injuries and contributing to a period of agonizing conscious suffering before his collapse and ultimate death.

186.    Officers unreasonably delayed providing medical assistance for several minutes despite clear observations that Jazmir was a child, had been shot multiple times, and posed no threat. This delay constitutes an additional injury suffered while Jazmir was still alive, which survives to his Estate.

187.    As a direct and proximate result of the Defendants' unconstitutional, reckless, and tortious conduct, Jazmir sustained personal injuries prior to his death, including but not limited to:

   a.    Physical pain and suffering

   b.    Emotional distress

   c.    Mental anguish

   d.    Fear of impending death

   e.    Loss of enjoyment of life

      f.      Diminished chance of survival based on delayed medical aid

      g.      Loss of income and earning capacity

188.    All such injuries are recoverable by the Estate under Ohio's Survival Statute, independent of and in addition to wrongful-death damages recoverable by statutory beneficiaries.

189.    Defendants' actions further entitle the Estate to compensatory damages, and, because of the reckless and wanton nature of the conduct, to punitive damages as permitted under Ohio law.

190.    The Estate therefore demands judgment against all individually named Defendant Officers for compensatory damages, punitive damages, attorneys' fees where permitted, and all other relief the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally including but not limited to:

A.      Compensatory and consequential damages in an amount to be determined by the Court in excess of the Court's jurisdictional amount;

B.      Punitive damages in an amount to be determined at trial, for the willful, reckless, and malicious conduct of Defendants;

C.      Equitable relief, including, without limitation, that Defendant City of Akron be made to adopt an appropriate policy to prevent future instances of the type of misconduct described herein;

D.      Attorneys' fees and the costs of this action and other costs that may be associated with this action; and

E.      Any and all other relief that this Court deems equitable, just and proper.

Respectfully submitted,

/s/ Robert L. Gresham
Michael L. Wright, #0067698
Robert L. Gresham, #0082151
WRIGHT & SCHULTE
130 W. Second Street, Suite 1600
Dayton, Ohio 45402
(937) 222-7477
(937) 222-7911          FAX
mwright@yourohiolegalhelp.com
rgresham@yourohiolegalhelp.com


/s/ Stanley Jackson
Stanley Jackson, #0077011
2000 Auburn Drive, Suite 200
Beachwood, Ohio 44122
(216) 333-3333
(513) 672-0184          FAX
sjackson@cochranohio.com


## JURY DEMAND

Plaintiff respectfully demands a trial by jury of the within matter.

/s/ Robert L. Gresham
Michael L. Wright, #0067698
Robert L. Gresham, #0082151